IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARMANE D. OGAWA,<br>         Plaintiff,<br><br>     v.<br><br>NATIONWIDE FINANCIAL SERVICES,<br>INC.,<br>         Defendant. | CIVIL ACTION<br><br>NO.  14-3147 |

**OPINION**

**I.     INTRODUCTION**

Plaintiff Charmane Ogawa alleges in this employment discrimination action that Defendant Nationwide Financial Services, Inc. ("Nationwide"), her former employer, discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA").[1]  Ogawa, who is African American, alleges that Nationwide illegally failed to promote her to either of two positions to which she applied.[2]

Before the Court is Nationwide's Motion for Summary Judgment, Ogawa's response in opposition thereto, and Nationwide's reply.  Because Ogawa has not established that a reasonable factfinder could find that she has satisfied the prima facie case for either her race discrimination or age discrimination claims, the motion shall be granted.

---

[1] The Third Circuit treats Title VII, ADEA, and PHRA claims coextensively.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

[2] Although Ogawa alleges in her Complaint that she applied for three positions, in her response in opposition to Nationwide's motion for summary judgment, she conceded that her failure to be promoted to the third position (that of "Senior Consultant, Business Program Management") does not give rise to a claim of discrimination.  *See* Opp'n at 1.  Thus, the Court will consider that claim abandoned and discuss only her applications for the other two positions.

II.     BACKGROUND

     A.      *Ogawa's Education and Employment History*

Charmane Ogawa received an Associates of Science degree in Paralegal Studies from Pierce Junior College in Philadelphia in 1991.  Def.'s Mot. Ex. E. ("Ogawa Dep.") at 30:22-31:7; *see also id.* Ex. O ("Ogawa Resume").  She began work at Friedman & Lorry in Philadelphia in 1996, and when she left the firm in December 2000 she was the Senior Domestic Relations Paralegal.  *See* Ogawa Resume.  She then worked as the Executive Assistant to the Chairman and CEO at Citizens Bank in Philadelphia from February 2001 through March 2004.  *Id.*  Following that, from February 2001 through February 2006 she was a Compliance Paralegal at Citizens Bank.  *Id.*

Ogawa was hired by Nationwide in 2007 as the Executive Secretary to Doff Meyer, the Vice President of Marketing for the Nationwide Financial Investment Management Group in King of Prussia, Pennsylvania.  *See* Ogawa Dep. at 19:8-17.  According to the job description for the Executive Secretary position, Ogawa's duties included managing correspondence and communications, managing Meyer's calendar, scheduling meetings, planning meal arrangements, coordinating travel arrangements, preparing reports and exhibits for presentations and projects, and maintaining office records.  *Id.* Ex. G.  She concedes that her position was administrative-secretarial and that she did not work on the investment side of the company.  Ogawa Dep. at 18:12-15, 19:14-17, 58:2-6.  According to her own resume, Ogawa's tasks in her position at Nationwide included managing external vendors and consultants, negotiating and managing external contracts and services, HR systems and employee relations, managing budgetary and financial activities, preparing agendas and collecting materials for corporate meetings, and managing off-site meetings.  Ogawa Resume.  Nationwide has an alphabetical spectrum "for job

identification and related salary ranges for non-officer employees, with an A-band at the entry level and an H-Band at the high end." Def.'s Mot. at 4; *see also id.* Ex. H ("McDonnell Dep.") at 22:10-24:5. Ogawa's position was a D-Band position. Def.'s Mot. Ex. CC ¶ 6.

In 2009, Ogawa earned a bachelor's degree in business administration from University of Phoenix. *Id.* at 75:19-25. She testified that Meyer informed her that if she continued her education and obtained a graduate degree, then she "definitely could help [her] move up in the company." *Id.* at 17:8-10. Many of Ogawa's performance evaluations written by Meyer reflect Ogawa's desire to advance at Nationwide and the steps she needed to take to achieve that goal. In her midyear 2011 evaluation, Meyer wrote of Ogawa that she was "putting new focus on a specific development plan and building skills that can help her in her goal to advance professionally." Def.'s Mot. Ex. I at 3. To that end, Meyer suggested that Ogawa develop a knowledge of the mutual fund market, beginning with the "[b]asics of Mutual Fund products and how they are promoted to advisers," and that she "[a]cquire as many competences required to advance in the company," as well as develop "biz knowledge." Def.'s Mot. Exs. J, K. In her end-of-year 2012 evaluation, Meyer wrote that Ogawa "has an opportunity to increase her industry knowledge by studying the wealth of information about mutual funds and the industry that is available on site at [King of Prussia]. This will be important if she wishes to move into the business unit." Def.'s Mot. Ex. L. In mid-2013, Meyer further stated that Ogawa's business knowledge "remains an opportunity for development" and that she "should learn about the business, our products and processes (beyond her immediate role)." Def.'s Mot. Ex. M.

In Spring 2011, Ogawa enrolled in a master's program at Lincoln University, and she received a Master of Science in Administration degree with a concentration in Human Resources

Management in December 2012.  Def.'s Mot. Ex. P.[3]  While a student at Lincoln, Ogawa took courses in Corporate Finance, Strategic Marketing Management, and Compensation Analysis & Planning, as well as a Global Financial Management seminar.  *Id.*  The remainder of her courses included Organizational Behavior, International Human Resource Management, Organizational Staffing, Employee and Labor Relations, Research Methodology, Management Information Systems, and Human Resource Management, and others.  *Id.*

  B.  *Senior Analyst, Proposals Position*

In May 2012, before Ogawa was awarded her master's degree, Jennifer McDonnell, the current Assistant Vice President of IMG Strategic Accounts at Nationwide, posted an opening for "Senior Analyst, Proposals," an E-band position tasked with the following responsibilities, among others:

- preparing responses to specific business related Requests for Proposals for existing and potential investment clients and customers;
- administering the proposal process, "working closely with all areas of the company to prepare a response that accurately reflects all current and proposed capabilities of assigned business/product";
- ensuring that responses are customized to meet clients' business objectives, are technically accurate, and are in compliance with all internal and external regulations;
- "[p]repar[ing] finalist presentations to support the efforts of the business development, and/or sales, accurately incorporating the components of the RFP responses"; and
- serving as a technical consultant to other areas of the company, including sales and product development.

*Id.* Ex. S.  The requirements for the position were as follows:

- undergraduate studies in business administration or a related field preferred;
- participation in, or attainment of, technical coursework;

---

[3] Nationwide has produced two Lincoln University transcripts.  The first, dated May 9, 2013, lists Ogawa's concentration as Finance.  The second, dated June 25, 2013, lists her concentration as Human Resources Management.  *See* Def.'s Mot. Ex. P.  Neither party has provided an explanation for the difference.

4

- required Federal and/or state licensing registration "within the time period designated by the business unit";[4]
- three years' experience "including, but not limited to, product plan administration and sales, customer services, sales consulting, relationship management, project management, communication, and marketing";
- knowledge of marketing techniques and approaches, systems analysis, and project management; and
- "[m]ust have knowledge of products, services and processes of the related business unit."

*Id.*

Ogawa applied for the position; she was approximately 42 years old at the time. Ogawa Dep. at 113:18-21. On June 29, 2012, she interviewed with McDonnell for approximately one hour. *See* McDonnell Dep. at 35:8. Ogawa testified at her deposition that she did not have experience coordinating response materials for requests for proposals, one of the principal responsibilities of the position. Ogawa Dep. at 70:18-23. She had never reviewed response documents for technical accuracy nor did she have experience "dealing with any sort of regulatory infrastructure that may apply to the investment side" of the company. *Id.* at 71:22-72:22. On the topic of financial regulations, Ogawa testified that she does not know what FINRA stands for, described Sarbanes-Oxley as "a regulatory institute," and acknowledged that while she had heard of Dodd-Frank, she did not know what it was. *Id.* at 73:4-24.

After the interview, McDonnell concluded that Ogawa lacked the "minimum relevant experience" for the position and that "her investment knowledge was not to the level that I needed for that role." McDonnell Dep. at 36:16-17, 36:21-23. McDonnell testified that at the time of the interview Ogawa had no certifications or resume-listed experience that gave McDonnell the sense she was qualified for the Senior Analyst position. *Id.* at 56:21-57:2.

---

[4] McDonnell acknowledged at her deposition that the FINRA licenses, while ultimately required to maintain the position, were not required at the time a candidate was placed. McDonnell Dep. at 19:6-10.

> A. There is nothing in here that is investment related. And investment is different than banking, so there's nothing investment related in this resume.
>
> Q. What sorts of things would you be looking for, for the senior analyst position specifically?
>
> A. I would be looking for roles that—where they did research and analysis on mutual funds, competitive analysis of products in the industry, the— having knowledge of mutual fund practices, mutual fund oversight, mutual fund analysis.

*Id.* at 57:4-16. Specifically, McDonnell believed that Ogawa's experience at Citizens Bank was not applicable to the position because "the banking regulatory environment is different from the investment regulatory environment"; she did not have a background in investments or "the amount of investment experience that I needed for that role"; and, although in her position of Executive Secretary she "worked with the various products," she "did not provide [her] with examples of where she had any investment content, investment-related activities in that role." *Id.* at 35:2-4, 37:12-14, 37:16-17, 37:22-24. Furthermore, she had no experience "[d]etermining whether . . . an expense ratio seems reasonable. Determining . . . the accuracy of a[n] investment process or investment philosophy" or "[w]hether the fund as stated on the materials were [sic] in the right category." *Id.* at 38:10-15. After Ogawa was informed by a Nationwide recruiter, Molly Yates, that she was not given the position, she asked McDonnell for feedback and McDonnell told her "that [she] did not feel that she had the investment knowledge necessary to do the job." *Id.* at 40:18-19.

McDonnell also interviewed Matthew Ryba for the Senior Analyst, Proposals position, and subsequently offered him the position. Def.'s Mot. Ex. U. Ryba was 25 years old at the time and is half Korean and half Caucasian. McDonnell Dep. at 54:10-13. According to his resume, Ryba graduated with a B.B.A. in International Business Administration and Finance from the Fox School of Business at Temple University. Def.'s Mot. Ex. V. Ryba took courses

6

in Corporate Finance, Financial Investments, International Trade, Derivatives & Risk Management, Financial Accounting, and International Monetary Economics. *Id.* While at Temple, he also took part in two internships. First, as a financial planning intern at Lincoln Financial Group, he "[d]eveloped leads and prepared relative investment opportunities for prospective clients according to their different classifications," "[c]onducted due diligence to prospect new clients within the tri-state area," and "[r]esearched and created presentations for clients regarding mutual fund performances," among other responsibilities. *Id.* Second, as a wealth management intern at UBS Wealth Management, he "[r]ecruited prospective clients and developed new relationships from due diligence leading to over 10 million dollars in new assets," "[a]ssisted in the preparation of comprehensive financial plans for new and existing clients," and "[a]nalyzed client portfolios and prepared reports used for client review meetings," among other projects. *Id.*

Ryba's most recent experience prior to applying for the Nationwide position was as a Fixed Income/Bank Loan Trade Support associate at JPMorgan Chase & Co., where he collaborated with traders and portfolio managers on a variety of tasks. *Id.* His resume also reflects experience with several substantive investment tools, including Bloomberg, Morningstar, ClearPar, FactSet, Oasys, and Wall Street Office. *Id.* Ogawa conceded that she did not have experience with any of these products. Ogawa Dep. at 74:13-75:19. She also agreed that, based on "the objective criteria of what was listed in the job description relative to Matthew Ryba's application and/or his resume[,] . . . he would appear to be the more qualified candidate." *Id.* at 91:15-21.

    **C.**    *Specialist/Lead, Business Information Position*

In May 2013, McDonnell posted an opening for "Specialist/Lead, Business Information," an F-band position tasked with responsibilities including:

7

- functioning "as the expert in data extraction from databases, tables, data warehouses, and other sources";
- observing "marketing and sales needs and proactively present[ing] recommendations that will aid salesforce";
- developing, producing, and maintaining "ad hoc and custom reports for information needs and analysis";
- determining "the level of information analysis needed based on internal customer needs and data availability";
- using "various data access tools, such as Morningstar Direct or SimFund, to pull information for reports and analysis";
- conducting "research for topical research-based sales ideas";
- supporting "the research, competitive analysis and presentation of information by: producing reports, compiling and summarizing information, producing supporting documentation and exhibits, and verifying information received from external sources"; and
- presenting "actionable recommendations, presentations, reports, and documents to help with the use of the information."

*Id.* Ex. X. Ogawa testified that she did not have any previous experience performing these tasks.

*See* Ogawa Dep. at 101:25-103:17. The requirements for the position were as follows:

- undergraduate studies in business, working toward graduate studies or CFA (Chartered Financial Analyst) preferred, and FINRA Series 7 preferred;
- six years' experience "in the mutual fund industry, preferably in mutual fund product management";
- knowledge of mutual funds, customer service concepts and practices; and
- "[w]orking knowledge of products, competitors, distribution partners and compliance/regulatory requirements that make up the 40 Act competitive landscape."

Def.'s Mot. Ex. X. In deposition, Ogawa testified to her belief that she had the requisite knowledge of mutual funds. *See* Ogawa Dep. at 105:9-106:5. She also stated that McDonnell shared that she would train someone in the role; furthermore, she believes that even if she did not have the fundamental knowledge of mutual funds the position required, "there is always a learning curve" and she could learn academically or on the job. *Id.* at 100:7-101:13; *see also*

8

McDonnell Dep. at 19:19-20:8.  However, when pressed about the specifics of mutual funds, and Nationwide's mutual funds in particular, she was unable to provide much detail:

> Q. [A]t the time that you applied for this position, give me an idea of the mutual funds that the finance group was selling?
>
> A. Well, I know right before I left they did a Highmark transaction.
>
> Q. Okay. What else?
>
> A. There were other mutual funds. I mean, I can't remember them off the top of my head, but there is knowledge of mutual funds, customer service concepts.
>
> Q. What knowledge did you have of mutual funds?
>
> A. Internal customer service. I mean—
>
> Q. What knowledge of mutual funds did you have? . . . Tell me about them. Tell me your knowledge of a mutual fund.
>
> A. Just—I know about them. I knew that we sold them. I knew that we were on a managers of managers pro—platform. I knew that, you know, we sold—we did not actually sell them, but it was on a platform of a managers of managers.
>
> Q. Tell me what a mutual fund is.
>
> A. It's an investment tool.
>
> Q. If you were to explain it to a sixth grade class, how would you describe it?
>
> A. I couldn't. I have some, and I couldn't explain it.

*Id.* at 106:7-107:13.  When Nationwide's counsel reminded Ogawa that the position, as detailed in the description, required knowledge of mutual funds, she expressed that she would have prepared for the position had she been offered it, and that Meyer had offered to "make sure that [she] prepared [her] for this job." *Id.* at 107:14-108:21.  She admitted, however, that before her interview she had performed "[j]ust minimal research on the position," *id.* at 109:10-11, and she conceded that she had no knowledge of the mutual fund portfolio Nationwide was selling at the time she applied for the position. *Id.* at 110:22-111:2.

After Ogawa applied for the position, Molly Yates, the same recruiter who worked on the Senior Analyst interview process, informed McDonnell that Ogawa had applied and asked if

9

McDonnell wanted to interview her. McDonnell declined, "[b]ecause it was a higher-level position with more experience that was required, and I did not believe that she had the investment expertise to do that role since she didn't have the investment expertise to do the role that was a level below it." McDonnell Dep. at 45:5-10. She also relayed to Yates her opinion that Ogawa was not qualified for the position. *Id.* at 49:11-50:2. At some point, though, Ogawa did interview with McDonnell. *See* Ogawa Dep. 94:6-9. Ogawa testified that, in the interview, she and McDonnell spoke about the position and "were both clear that [she] could definitely do the job. It wasn't about experience or anything. She showed me on the computer, this is what you would be doing. This is something definitely you could—you know, you could do the job." *Id.* at 94:13-18. Ogawa further testified that, during the course of the interview, McDonnell indicated that Ogawa would be subjected to "prejudices and biases" were she to be offered the position. *Id.* at 111:15-16, 112:18-21. However, she conceded that nothing McDonnell "sa[id] in that statement . . . specifically addressed whether or not that had anything to do with your race and/or gender," and that it is possible it could have been in reference to her "coming from an executive assistant role" or "coming from a marketing role to [the] investment side of the house." *Id.* at 112:22-113:13. Regardless, she agreed that she did not have the proper level of experience required for the position. *Id.* at 115:11-19.

The position ultimately went to Mark Costantini, a 27-year-old Caucasian. Def.'s Mot. at 12. Costantini graduated with a Bachelor of Science in Business Economics from Penn State University in 2009 and was a Level 1 Candidate in Penn State's CFA program. *Id.* Ex. Z. He also has both FINRA Series 6 and 63 licenses. *Id.* Prior to accepting the position at Nationwide, he had worked in retirement plans for over a year as a Client Relationship associate with the Vanguard Group. *Id.*

**D.** *Procedural History*

Ogawa filed a complaint on June 4, 2014, alleging that Nationwide's failure to promote her was based on impermissible race discrimination in violation of Title VII and the PHRA and impermissible age discrimination in violation of the ADEA and the PHRA. *See* Compl. ¶¶ 20-39.

Nationwide has moved for summary judgment on both the race discrimination and age discrimination claims. As to the race discrimination claim, it argues that Ogawa cannot establish a prima facie case of race discrimination because she was not objectively qualified for the Senior Analyst or Specialist/Lead positions, because she admits the selected candidates were more qualified than she and because she cannot establish that McDonnell's decision to hire Ryba and Costantini were pretext for discrimination. *See* Def.'s Mot. at 18-28. Ogawa counters that there is a genuine issue of material fact as to whether she was qualified for the positions and that she was not promoted "under circumstances that give rise to an inference of unlawful discrimination." Pl.'s Opp'n at 12. She argues further that she establishes pretext because McDonnell hired four internal employees, all of whom were Caucasian, and because there were no African American employees on her team in 2012 and 2013. *See id.* at 12-17.

As to the age discrimination claim, Nationwide reiterates its arguments that Ogawa fails to establish a prima facie case because she was not objectively qualified and she admits Ryba and Costantini were more qualified than she, and she has presented no evidence to suggest that her failure to be selected for the positions was pretext for age discrimination because she cannot prove that age was the "but for" cause of the challenged adverse employment action. Def.'s Mot. at 29-32. Ogawa counters that she establishes a prima facie case of age discrimination because there is a genuine issue of material fact as to whether she was qualified for the position and the disparity in ages between her and Ryba/Costantini establishes pretext. Pl.'s Opp'n at 19-22.

### III. LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (alteration in original) (quoting *Anderson*, 477 U.S. at 252).

## IV. DISCUSSION

### A. *Race Discrimination*

The parties agree that Ogawa's race discrimination claims should be analyzed using the three-step burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, Ogawa's burden is first to establish each element of a prima facie case of unlawful discrimination through a failure to promote: (1) she is a member of a protected class; (2) she applied and was qualified for the position(s) for which she applied; (3) she was rejected for the position; and (4) after her rejection, Nationwide filled the position by selecting someone of lesser or equivalent qualifications who was not a member of her protected class. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see also Scheidemantle*, 470 F.3d at 540-41 (noting that courts should look to the hiring decision to determine if the plaintiff was at least as qualified as—not necessarily better qualified than—the person selected for the position); *Bray v. Marriott Hotels*, 110 F.3d 986, 989-90 (3d Cir. 1997); *Gilmore v. Federated Dep't Stores, Inc.*, No. 06-3020, 2008 WL 687260, at *4 (D.N.J. Mar. 11, 2008) ("*Gilmore I*"), *aff'd sub nom. Gilmore v. Macys Retail Holdings, Inc.*, 385 F. App'x 233, 237 (3d Cir. 2010) (per curiam) ("*Gilmore II*"); *accord Roebuck v. Drexel Univ.*, 852 F.2d 715, 726 (3d Cir. 1988) (confirming that "the precise elements of a prima facie showing . . . vary depending on the circumstances of the case"). If Ogawa succeeds on her prima facie case, the burden of production shifts to Nationwide to articulate a legitimate, nondiscriminatory reason for Ogawa's rejection. *Fuentes*, 32 F.3d at 763. Nationwide "need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 254, 256 (1981)). If Nationwide is able to provide such a reason, the burden

13

of production shifts back to Ogawa, who must then show that Nationwide's proffered legitimate, nondiscriminatory reason is merely pretext for actual discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Nationwide concedes that Ogawa satisfies the first and third elements of the prima facie case, but it contends that the same cannot be said of the second (that she was qualified for the position) and fourth (that Nationwide filled the position by selecting someone of lesser or equivalent qualifications outside her protected class). *See* Def.'s Mot. at 18-21.

### 1. Whether Ogawa Was Qualified for the Positions

In analyzing whether Ogawa was qualified for the positions she sought, the Court must view her qualifications objectively, determining whether she has the experience and education necessary to be a viable candidate for the position at issue. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). The Court finds that Ogawa was not qualified for either of the positions she sought—the Specialist/Lead position or the Senior Analyst position.

#### a. *Specialist/Lead Position*

The job description for the Specialist/Lead position required "information analysis . . . based on internal customer needs and data availability"; using "various data access tools, such as Morningstar Direct or SimFund, to pull information for reports and analysis"; conducting "research for topical research-based sales ideas"; and supporting "the research, competitive analysis and presentation of information by: producing reports, compiling and summarizing information, producing supporting documentation and exhibits, and verifying information received from external sources." Def.'s Mot. Ex. X. Ogawa testified she had no experience performing these tasks. Ogawa Dep. at 105:9-106:5.

When pressed at her deposition about the specifics of her knowledge of mutual funds—knowledge that was required for the position—Ogawa faltered, calling them "an investment tool" and stating, "Just—I know about them. I knew that we sold them. I knew that we were on a managers of managers pro—platform. I knew that, you know, we sold—we did not actually sell them, but it was on a platform of a managers of managers." *Id.* at 107:2-7, 107:9. When asked if she could explain a mutual fund to a sixth grade class, she answered, "I couldn't. I have some, and I couldn't explain it." *Id.* at 107:12-13. In short, Ogawa agreed that she did not have the proper experience for the position:

> Q. After we looked at the job description—
> A. Yes.
> Q. —you agree with me that certainly based on what you had done previously and what the role required you to do, you had not had the requisite, relevant experience, correct?
> A. Yes, I guess, yes.

*Id.* at 115:11-19.

In Ogawa's defense, she testified that not only could she learn on the job, but also that she was supported in that belief by McDonnell, who conceded that "if a person had a foundational knowledge of investment, [she] could learn the rest of what was required to perform the . . . position, including compliance regulations, while working on the job." Pl.'s Opp'n at 14-15 (citing McDonnell Dep. at 18:24-20:21). Whether or not she could learn on the job is beside the point here, because the Court must "look to a candidate's qualifications as they existed at the time the hiring decision was made, not their potential to be qualified at some point in the future." *Peace-Wickham v. Walls*, 409 F. App'x 512, 525 (3d Cir. 2010). Even viewing Ogawa's education and previous experience in the light most favorable to her, there is no genuine issue of

15

material fact that she was simply not objectively qualified for the Specialist/Lead position at the time she applied for the job.

### b. *Senior Analyst Position*

There is similarly no genuine issue of material fact about Ogawa's qualifications for the Senior Analyst position—she was not qualified for that position at the time she applied, either. The Senior Analyst position, as advertised, required three years' experience "including, but not limited to, product plan administration and sales, customer services, sales consulting, relationship management, project management, communication, and marketing"; knowledge of marketing techniques and approaches, systems analysis, and project management; and "knowledge of products, services and processes of the related business unit." Def.'s Mot. Ex. S. Ogawa's resume includes a position as a domestic relations paralegal, a banking paralegal, and as an executive assistant. *See* Ogawa Resume. Nothing in her credentials lends itself toward satisfaction of the position's advertised requirements. McDonnell testified that Ogawa had no experience "[d]etermining whether . . . an expense ratio seems reasonable. Determining . . . the accuracy of a[n] investment process or investment philosophy" or "[w]hether the fund as stated on the materials were [sic] in the right category." McDonnell Dep. at 38:10-15.

Ogawa does not contradict this testimony. At her deposition, she testified that she did not have experience coordinating materials for requests for proposals, nor had she reviewed response documents for technical accuracy or had any experience dealing with investment regulations, all skills which were required by the job criteria. Ogawa Dep. at 70:18-23, 71:22-72:22. Furthermore, she had little to no understanding of the legal framework within which any candidate for the job would be working: she was unaware of what FINRA stands for, she did not know what "Dodd-Frank" is, and she described Sarbanes-Oxley as "a regulatory institute." *Id.* at

16

73:4-24.  McDonnell testified that she found Ogawa lacked the "minimum relevant experience" for the position.  McDonnell Dep. at 36:16-17.[5]  She simply did not possess the required qualifications.  And her subjective view of her experience as a banking paralegal and a few courses taken toward a not-yet-conferred master's degree does not change that result.  *See Rhett v. Carnegie Ctr. Assocs.* (*In re Carnegie Ctr. Assocs.*), 129 F.3d 290, 298 (3d Cir. 1997) (noting that a plaintiff must offer more than her own assessment of her qualifications in support of her argument that she was qualified for the position).

Viewing Ogawa's qualifications objectively, the Court concludes that no factfinder could reasonably find that she had the experience and education necessary to be a viable candidate for the Senior Analyst position.  *See Sempier*, 45 F.3d at 729.  Accordingly, she has failed to satisfy this element for the prima facie case in regards to the Senior Analyst position.

### 2. Whether Nationwide Selected Individuals of Lesser or Equivalent Qualifications to Fill the Positions

This Court finds also Ogawa cannot satisfy the fourth element of the prima facie case, as she cannot show that a trier of fact could rationally find that Nationwide selected someone of lesser or equivalent qualifications to fill either the Senior Analyst or Specialist/Lead positions.  In fact, each position was filled by an individual who was a superior fit for the job.

*Gilmore II*, cited by Nationwide, is informative here.  In that case, a panel of the Third Circuit summarily affirmed the district court's disposal of the African American plaintiff's failure-to-promote race discrimination claim, based upon the employer's decision to promote a

---

[5] Ogawa argues that McDonnell's testimony that Ogawa did not have the "minimum relevant experience" to perform either job should be disregarded because she is an "interested witness."  *See* Pl.'s Opp'n at 10, 15.  This argument is foreclosed by the Third Circuit's decision in *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 & n.13 (3d Cir. 2007), in which it stated that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness," because to do otherwise, "contrary to all precedent, . . . would allow the non-moving party to defeat the motion with mere allegations."  McDonnell's testimony—far from being implausible—verifies the statements that Ogawa herself made about her qualifications.

Caucasian employee to the Macy's jewelry department's "diamond bay," finding there was no genuine dispute that the other employee was "significantly more qualified than [the plaintiff]." 385 F. App'x at 237.  Although the plaintiff, who was staffed in the less-prestigious "gold bay," expressed sincere and consistent interest in being transferred to the diamond bay, she had been selling jewelry for less than four years when the diamond bay opening became available; the other employee, by contrast, had previously worked at a Zales jewelry store for two years (during which she completed a two-year training curriculum on diamonds), in the diamond bay at Macy's for thirteen years, and in the jewelry department for one or two years before being transferred back to the diamond bay.  *Gilmore I*, 2008 WL 687260, at *5.  The plaintiff conceded that the other employee had "significantly more experience for the position" than the Plaintiff did.  *Id.*  The job criteria included the requirement that an applicant "[d]emonstrate [] advanced knowledge of store products and use[] this knowledge to build and enhance the level of customer service provided," and the other employee's experience with and knowledge of diamonds "manifestly met" this standard."  *Id.*

Here, like the difference between the plaintiff and the other employee in *Gilmore*, the difference in qualifications between Ogawa and Ryba for the Senior Analyst position is clear, and it is beyond genuine dispute that Ryba was more qualified for the position.  Although Ogawa did have a bachelor's degree in Business Management (and had taken some finance courses toward her not-then-conferred master's degree), she did not have an investment background.  *See* Ogawa Resume; Ogawa Dep. at 18:12-15, 19:14-17, 58:2-6.  Her prior work experience was as a domestic relations paralegal, a banking paralegal, and an executive assistant.  *See* Ogawa Resume.  As outlined above in Section II.B, she had no experience in most of the competencies required for the position of Senior Analyst.  Ryba, by contrast, had a bachelor's degree in International Business Administration and Finance; he had taken several relevant finance and

18

investment courses at college; he was proficient in at least six different substantive investment tools; and he had internship experience in financial planning and wealth management and work experience in trade support during which he performed many of the tasks relevant for the Senior Analyst position, including preparing investment opportunities and financial plans for existing and prospective clients. *See supra* Section II.B.

Similarly, the difference in qualifications between Ogawa and Costantini for the Specialist/Lead position is marked. Ogawa admitted that she did not have experience performing any of the tasks required for the position, *see* Ogawa Dep. at 101:25-103:17, her deposition testimony revealed that she had nearly no mutual fund knowledge, *see supra* Section II.C, and she herself agreed with Nationwide counsel's proposition that she "had not had the requisite, relevant experience" for the position. Ogawa Dep. at 115:11-19. Costantini, on the other hand, has a bachelor's in business economics and was a Level 1 Candidate in Penn State's CFA program—one of the preferred requirements for the position. He possessed two FINRA licenses and had previous employment experience working in retirement plans. Def.'s Mot. Ex. Z.

The evidence before the Court is that Ogawa was less qualified than the people who were offered the positions she sought and, thus, she has failed to satisfy the fourth element of the prima facie case, *see Jewett v. Int'l Tel. & Tel. Corp.*, 653, F.2d 89, 91 (3d Cir. 1981) (holding in failure-to-promote context that the plaintiff failed to make out a prima facie case because the person who was promoted had "superior qualifications"), and, as such, Nationwide's summary judgment motion as to Ogawa's Title VII and PHRA race discrimination claims will be granted. *See Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001) (stating that, for a plaintiff to survive summary judgment, "the evidence must be sufficient to convince a reasonable factfinder to find *all* of the elements of [the] prima facie case") (emphasis added) (alteration in original) (internal quotation marks omitted)).

B.  *Age Discrimination*

Ogawa's age discrimination claims under the ADEA and PHRA are premised on indirect, rather than direct, discrimination, *see* Pl.'s Opp'n at 18-19, and, thus, are also analyzed under the same *McDonnell Douglas* burden-shifting paradigm as her race discrimination claims.  *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  As in the race discrimination context, Nationwide concedes that Ogawa satisfies the first and third elements of the prima facie case but contests her satisfaction of the second (that she was qualified for the position) and fourth (that Nationwide filled the position by selecting someone of lesser or equivalent qualifications outside her protected class).  Def.'s Mot. at 29-30.  This Court's reasoning in the race discrimination context above informs its analysis in the age discrimination context here:  the Court concludes that, although Ryba and Costantini were both in their twenties at the time they were hired and thus outside the protected class, Ogawa has not established that she was qualified for the Senior Analyst or Specialist/Lead positions and she has not shown that either man had lesser or equivalent qualifications at the time of their hires.

Accordingly, Ogawa has failed to establish a prima facie case of age discrimination, and summary judgment on her age discrimination claims is warranted.  *See Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009); *Jakimas*, 485 F.3d at 777.

An appropriate Order follows.


Dated:  **April 2, 2015**

                                        **BY THE COURT:**

                                        **/S/ WENDY BEETLESTONE, J.**

                                        _____
                                        **WENDY BEETLESTONE, J.**